## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| TONY DION JAMES BEACH ARMSTRONG, | ) ) ) | No. 4:08-cv-00424-JEG-CFB |
| Plaintiff, | ) ) | |
| vs. | ) ) | **REPORT AND RECOMMENDATION ON DEFENDANTS'** |
| MIKE LONG and DR. FRANK FILIPPELLI, | ) ) ) | **MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) ) ) | |

This matter comes before the Court on the Motion for Summary Judgment (Clerk's No. 47), filed on December 16, 2010, by Defendants Mike Long and Dr. Frank Filippelli. Plaintiff Tony Armstrong, an inmate at the Newton Correctional Facility (NCF), brings this action under 42 U.S.C. § 1983 for violations of his Eighth Amendment rights. Armstrong claims that Long, a correctional officer at NCF, forced him to clean up raw sewage without personal protective equipment, resulting in injury. Armstrong alleges that Dr. Filippelli, a prison doctor at NCF, was deliberately indifferent to his serious medical needs following the cleanup. Armstrong seeks monetary damages, punitive damages[1], and injunctive relief.

In their present Motion, Defendants assert they are entitled to summary judgment, because there are no disputed material facts and they are entitled to judgment as a matter of law on the basis of qualified immunity. Defendants further maintain that Armstrong's monetary damages claim is barred by 42 U.S.C. § 1997e(e), punitive damages are not available, and Armstrong's injunctive relief claim is moot. Armstrong filed a Resistance (Clerk's No. 54) on February 16, 2011. Defendants filed a Reply (Clerk's No. 61) on March 25, 2011.

This case was referred to the undersigned on July 15, 2010, for a Report and

---

[1] Plaintiff moved to amend his pro se complaint to include a request for punitive damages. Br. Supp. Res. Defs.' Second Mot. Summ. J. 4 n1. (Clerk's No. 54-1.)

1

Recommendation under 28 U.S.C. § 636(b)(1)(B). These matters are fully submitted. After carefully considering the evidence and memoranda presented by the parties, the Court finds and recommends as follows on the issues presented.

## FINDINGS OF FACT

Unless noted otherwise, the following facts are undisputed or viewed in the light most favorable to Armstrong, the nonmoving party.

### Facts About the Cleanup

Armstrong was transferred to NCF on July 13, 2006. In September 2006, he became a unit cleaner on Unit D, a general population unit at the prison. Armstrong alleges that he has "never been trained in the handling of raw sewage or in handling bio hazards [sic]." Armstrong Aff. ¶ 3. He received instructions regarding the proper use of various chemicals including liquid bleach and information about appropriate safety equipment in May 2000 while he was incarcerated at another Iowa prison.

On July 5, 2007, at 2:00 p.m., Defendant Long began his shift at the officer's station on Unit D. At approximately 2:30 p.m., Armstrong began his shift as one of six unit cleaners on Unit D. Long asserts that at approximately 3:00 p.m., an inmate told Long he needed a plumber for the toilet in his cell, #15, in the unit's right wing. Long directed an inmate plumber, accompanied by a correctional officer, to go fix the toilet. The correctional officer reported back to Long that when the toilet in cell #15 was flushed, the toilet in cell #14 backed up and overflowed. The inmate plumber could not fix the problem. Long removed the inmates from cells #14 and #15 and called maintenance to fix the toilets. At approximately 6:00 or 6:30 p.m., a correctional officer told Long that water was coming up from the back floor drain in the right wing. Long went to the right wing's common area, where he saw "clear water was coming up through the two floor drains," which were approximately 40 feet apart. Long Aff. ¶ 4.

At approximately 6:00 or 6:30 p.m., Armstrong was called to help clean up "the sewage coming out of the toilets in the cells and out of the floor drains." Armstrong Aff. ¶ 4. Armstrong stated that he "initially asked to refuse the task," but Long told him that he and any other inmate who refused to participate would be sent to lockup. *Id.* Armstrong stated he complied with Long's orders so he would not be sent to lockup.

Long told "the six unit cleaners to go to the utility closet, get buckets, mops and anything

2

else they might need, . . . to clean up the water." Long Aff. ¶ 6. According to Long, the utility closet had "protective equipment for the unit cleaners to wear if they chose, including eye goggles." *Id.* He did not specify what protective equipment was available other than eye goggles. The officer stated that the inmates each "stopped at the officer's station to get plastic gloves to wear," and he saw, "None of them had on the eye goggles." *Id.*

Armstrong stated that although he and the other inmates were given plastic gloves before they began the cleanup, "Rubber gloves, rubber boots, respirators and face shields were not made available to us." Armstrong Aff. ¶ 5. According to Armstrong, the utility closet had eye goggles, but when "I took one pair out to use them, they were dirty and contaminated and not usable." *Id.* When Armstrong asked Long for a clean pair of goggles, Long said, "there were no clean goggles available for us to use." *Id.*

At approximately 7:00 p.m., the inmates began mopping. The parties dispute the nature of the material the inmates were mopping up and whether ventilation to the outside was present at the beginning of the cleanup. Long stated that the "water the cleaners were mopping up was clear." Long Aff. ¶ 6. Armstrong, in contrast, testified, "At no time was the sewage coming out of the drains clear or just water, but instead it was always dirty, contaminated raw sewage," Armstrong Aff. ¶ 2.

Although Long contended the inmates were at first cleaning up only clear water, he also asserted that all during the cleanup, the right wing's fire door was open, "in order that the right wing was well ventilated," and, "to allow the inmate workers to step outside for a smoke or to rest and get fresh air at any time during the cleanup." Long Aff. ¶ 6. Armstrong, however, stated that the fire door was not open at the beginning of the cleanup, and was only opened after Long determined that, "due to particles of feces and toilet paper in the sewage, as well as the sheer volume of waste coming out of the floor drain," the inmates needed to dump the waste outside onto the ground rather than down the floor drain in the mop closet. Armstrong Aff. ¶ 7.

At some point, the inmates used mop heads to construct a makeshift dam or barricade around the floor drains to stop the material that was coming out of the drains from spreading into cells. Armstrong asserted that, "more sewage was coming up through the drains than we were able to remove from the floor," and the barricades they had built were "overrun and the entire recreation room was covered in sewage approximately 3 inches deep." *Id.* at ¶ 9. Armstrong

3

stated, "This flood of sewage contained obvious human waste." *Id.* According to Armstrong, the increase in sewage was "caused by the continuous flushing of toilets" by inmates on the wing. *Id.*

Long indicated that at approximately 7:00 p.m., staff on Unit D asked inmates, other than those cleaning, to leave. At approximately 7:30 p.m., Long asked his supervisor for permission to have the water on the right wing shut off. After the water was shut off, "water stopped coming up from the two floor drains," Long said. Long Aff. ¶ 8.

Long asked staff to bring bleach to Unit D, "to sanitize the area where the water had been," including the floor and tables. *Id.* A correctional officer brought the bleach, which Long described as a "mixture of 1 part bleach to 10 parts water." *Id.* According to Long, the unit cleaners were given more water to add to the diluted bleach solution before using it to clean and sanitize. Armstrong, in contrast, testified the bleach the inmates were provided "was not diluted, it was concentrated bleach straight from the bottle." Armstrong Aff. ¶ 12. Armstrong maintained he filled spray bottles with the concentrated bleach. He also poured the undiluted bleach into buckets, where the bleach was diluted with water for mopping. Armstrong stated, "I was not provided with appropriate protective gear when handling this bleach," and the bleach, "came into contact with my skin, and I breathed in the fumes." *Id.*

At approximately 8:00 p.m., inmate maintenance workers arrived and tried to fix the plumbing problem by using a snake on the floor drains. At approximately 8:30 p.m., stated Long, maintenance workers started to retrieve pieces of cloth from the drain.

At 9:15 p.m., the Unit D inmates returned to their cells for the evening count. The unit cleaners stopped cleaning during the count of inmates. Two of the unit cleaners left, leaving Armstrong and three other cleaners. After the count, the unit cleaners resumed sanitizing the area.

The maintenance workers said they thought the drain problem was fixed, and the water to the right wing was turned on again. Soon, however, the water began coming up again from the same two floor drains, but unlike previously, according to Long, this time the water "contained small amounts of fecal matter and a few scraps of toilet paper." Long Aff. ¶ 11. The water was turned off, and the inmate cleaners again "cleaned and sanitized the immediate floor area surrounding the two floor drains." *Id.* At 10 p.m., Long's shift ended.

4

Long stated that, "At no time did any of the unit cleaners express any concern" about mopping up the water, filling the mop buckets with the water, and dumping the water in the buckets outside. *Id.* at ¶ 6. He further contended that "[t]hroughout the entire episode, [neither] Armstrong nor any other inmate cleaner, maintenance worker or staff complained of anything about doing the task. No one complained of bleach in the eyes or fumes." *Id.* at ¶ 12 (alterations added). Armstrong, however, stated, "I, and other inmates, complained about the cleanup assignment at the time, and continued to complain about it throughout the ordeal, to no avail." Armstrong Aff. ¶ 14.

When Armstrong began the cleanup, he was wearing tennis shoes, but during the cleanup he had to go to his cell to change his shoes and socks, because "sewage had completely soaked through" them. *Id.* at ¶ 10. He put on work boots and returned to the cleanup area, but the boots "also became soaked through by the time I was done." *Id.* Armstrong stated that throughout the cleanup, his face was "splashed with sewage"; he had sewage in his hair; his arms were covered in sewage; his plastic gloves ripped, "causing my hands to come into contact with sewage"; and sewage also "ran inside the gloves from the wrists." *Id.* at ¶ 11.

Armstrong cleaned until about 1:45 a.m., when he took a shower. After his shower, he and another inmate were told to clean out vacuums used in the cleanup, which he did until 2:30 a.m.

Armstrong returned to his cell, where "[a]lmost immediately," he "started feeling sick . . . had a fever, chills, sweats and a sore throat." *Id.* at ¶ 15 (alteration added). He "would wake up with [his] sheets drenched with sweat"; his "face and throat glands started swelling"; and an "open sore developed on [his] face almost immediately." *Id.* (alterations added). Armstrong maintains he "had not suffered from any of these conditions until after [he] was covered in raw sewage on July 5." *Id.* (alteration added).

As a result of complaints about conditions during the cleanup, Iowa's Occupational Safety and Health Bureau conducted an inspection at NCF from July 31 to August 10, 2007. On September 14, the agency issued a Citation and Notification of Penalty describing violations of the Iowa Occupational Safety and Health Act, as follows:

> Protective eye equipment was not required or provided where there was a reasonable probability of injury that could be prevented by such equipment:

> (a) Unit D Right Wing Day Room - Employees were exposed to potential viral and bacterial infections as a result of face splashes while cleaning sewage and sewage products, and eye injuries from chemicals such as liquid bleach. Eye protection was not provided or used during the July 5, 2007 incident.

Pl.'s App. 43. The agency stated that the prison must abate the violations outlined in the Citation by September 26, 2007.

### Facts About Armstrong's Medical Care

Armstrong asserted that sometime before July 31, 2007, he "requested to receive medical attention" for the symptoms he suffered soon after the cleanup, but his request was denied. Armstrong Aff. ¶ 16. He did not indicate to whom or how he submitted this request, or who denied the request.

On July 31, 2007, Armstrong filed a five-page grievance complaining about circumstances during the July 5 cleanup, including the amount of sewage to which he was exposed, and the lack of protective clothing and equipment. In the grievance, he wrote, "I'm sick"; he contended he "recently was made ill" as a result of the cleanup; and he requested "testing for diseases." Pl.'s App. 9. Armstrong stated that the morning after the cleanup, he saw a cut on his finger and "also felt bad," but "I figured I'd get over it soon." *Id.* at 13. "After a couple of weeks I thought I was better yet my lungs hurt," he wrote. *Id.* "Here it is 3 ½ weeks later and I'm . . . much worse. My glands are extremely swollen. My throat is raw. My mouth has sores. I'm coughing up ph[legm] with blood taint to it. I'm miserable." *Id.* (alteration added). Armstrong stated that he had "recently paid $80-90 for blood work to make sure I had no disease. . . . I can't afford to pay for these tests again. . . As sick as I am I need new tests." *Id.*

Armstrong also stated that at the end of July 2007, he submitted a kite (a written note) to the prison's health services staff. No evidence indicates that after the July 5 cleanup, he submitted a kite to health services before the one at the end of July. Armstrong was seen in health services on August 1, 2007. The nurse, Mona Holland, RN, who saw him, wrote in the medical record that Armstrong said his throat had been sore since he participated in the July 5 cleanup. Holland recorded Armstrong's temperature as 98.2°F. She indicated his throat was red, and he had a "small amount of lymph node edema," or swelling. Defs.' App. 14. She scheduled

an appointment for the inmate to see the prison physician on August 3.

After seeing the nurse, Armstrong wrote a grievance dated August 1, 2007, stating on the form that the grievance concerned an emergency. "I'm sick," he wrote. Pl.'s App. 14. "I was told yes my face is swollen and yes my throat was red yet because I didn't have a temp[erature] I wasn't sick. . . . I've got sicker and sicker. . . . Rested all this last week. . . . Tried to see [doctor]. Made to sound that I possibly couldn't be sick." *Id.* (alterations added).

Armstrong saw Defendant Dr. Filippelli in health services on August 3, 2007. Dr. Filippelli recounted in his affidavit relevant portions of Armstrong's medical history as follows. In May 2000, when Armstrong returned to prison, he was 33 years old and weighed 193 pounds. He was diagnosed with hypertension in 2003, and with high cholesterol and arthritis in 2004. Armstrong had been taking medication for those conditions "for a number of years" by December 16, 2010, when Dr. Filippelli signed his affidavit. Filippelli Aff. ¶ 2. In 2006, Armstrong was diagnosed with Ménière's disease[2]. In April 2006, Armstrong "was exposed to potentially infectious blood and saliva," as a result of an altercation with another inmate. *Id.* at ¶ 4. Prison medical staff tested Armstrong's blood for HIV, and hepatitis B and C, and his blood tested negative. He weighed 196 pounds. Dr. Filippelli stated that in April 2007, the inmate's blood again tested negative for HIV, and hepatitis B and C.

After examining Armstrong on August 3, 2007, Dr. Filippelli wrote in the medical record that Armstrong "was involved in cleanup of sewage on July 5, 2007 and bel[ie]ves he has residual problems from that episode." Defs.' App. 15 (alteration added). Armstrong claimed that his face was swollen, and was "extremely concerned." *Id.* The doctor stated he had the nurse observe Armstrong "and touched the area that he says is 'swollen'. The area is not indurated, but may be 'slightly enlarged' but inmate is focused on this." *Id.* When Dr. Filippelli told Armstrong he "did not perceive any swelling," the inmate "was very upset that I couldn't see what he believed." Filippelli Aff. ¶ 6.

Armstrong also complained that his sore throat was associated with the sewage cleanup he had done a month earlier, but the doctor "advised him that this was not the case." *Id.* Dr.

---

[2] Ménière's disease is a disease of the inner ear that causes vertigo and dizziness. Jane Rice, *Medical Terminology with Human Anatomy* 450 (4th ed. 1999).

7

Filippelli stated that an examination of Armstrong's head and neck "showed fluid levels behind his tympanic membrane[3]," but, according to the doctor, "this is how he usually appears," and Dr. Filippelli found "no evidence of a bacterial infection." Defs.' App. 15. Armstrong's temperature was 99°F. The doctor told Armstrong he believed he had a viral upper respiratory infection, and that no antibiotics "would make this better." Filippelli Aff. ¶ 6. He offered Armstrong acetaminophen for his discomfort and recommended that he increase the amount of fluids he was drinking. Armstrong, however, "insisted that he needed to be on antibiotics and stated he would be contacting his attorney since I was refusing to treat him," the doctor stated. *Id.*

On August 3, after seeing the doctor, Armstrong wrote a grievance, indicating on the form that the grievance concerned an emergency. He wrote, "Dr. refused to treat me. Said he <u>didn't</u> know what was wrong with me except maybe I have a <u>virus</u>?? Not likely! I went and seen the Dr. and he told me I <u>wasn't</u> sick. How could he say that? I'm very swollen on my glands." Pl.'s App. 17 (emphasis in original). On the grievance form section labeled "Action Requested," Armstrong wrote, "To try something. Last time two days previous my face <u>was</u> swollen. It's now more so yet now they say it ain[']t. Said I didn't have a temp. So I wouldn't be sick. Yet my temp is 1° higher." *Id.* (alteration added) (emphasis in original). On August 6, the grievance officer signed Armstrong's grievances dated July 31, and August 1 and 3, acknowledging their receipt.

Dr. Filippelli testified, "Armstrong next contacted Health Services via a kite," on August 8, 2007; the inmate was "again complaining of facial swelling." Filippelli Aff. ¶ 7. Nurse Holland reviewed the kite with Dr. Filippelli. Holland wrote in the medical record that she told Armstrong to continue taking Tylenol, resting and drinking fluids, and informed him that the doctor, after reviewing the kite, "is advising you to kite the Dentist to rule out dental cause of your discomfort." Defs.' App. 18. Dr. Filippelli recommended the inmate contact the prison dentist because, "I was unable to ascertain the swelling that he was referring to." Filippelli Aff. ¶ 7.

---

[3] The tympanic membrane is the eardrum, which "separates the external ear from the middle ear." Rice, *supra* note 2, at 440.

Armstrong's dental record shows he was seen by the prison dentist on August 13, 2007, complaining of a sensitive back molar. Defs.' Reply, Attach. The dentist determined that the tooth had root exposure sensitivity and a possible fracture.

On August 13, 2007, Armstrong wrote a grievance stating, "Still sick. Dr. refuses to see me. Treat me. My glands, lymph nodes swollen. Feel bad. . . . At least have the Dr. try something. Or even see me." Pl.'s App. 23. The grievance officer signed the receipt for the grievance on August 20. The officer processed the grievance as non-grievable, indicating Armstrong had already grieved the issue in his August 1 grievance. No evidence indicates Dr. Filippelli saw or learned about the August 13 grievance, or that Armstrong submitted a kite for medical services prior to, or at the time of, the August 13 grievance. Armstrong does not assert that he filed any kite for medical care on or after August 13. He contends that in his appeals of the denials of his grievances, he asked for medical care; no evidence indicates Dr. Filippelli saw or learned about the contents of these appeals. Armstrong maintains that on October 15, 2007, he filed a grievance requesting medical care. The record does not include a copy of this grievance, and no evidence indicates Dr. Filippelli saw or learned about the October 15 grievance.

On October 26, 2007, Dr. Filippelli saw Armstrong for a "Hyperlipidemia[4] follow up." Defs.' App. 19. Armstrong stated that he asked Fillipelli "to look at the open sore on my neck that I had since July 7." Armstrong Aff. ¶ 23. The doctor wrote in the medical record that Armstrong "has a cystic infected hair follicle on his neck that he associates with" his cleaning up sewage in July 2007. Defs.' App. 19. Dr. Filippelli prescribed doxycycline, an antibiotic, and wrote he would "follow up in 10 days," and might "need to excise it." *Id.* The doctor testified that in his medical opinion, "the ingrown hair was in no way associated with the July 5, 2007 clean up." Filippelli Aff. ¶ 9.

On October 29, 2007, Dr. Filippelli wrote in the medical record that Armstrong's hypertension was stable, and he ordered that laboratory work be done on October 31 to provide a chemical profile of Armstrong's blood. The doctor scheduled a follow-up appointment for the

---

[4] Hyperlipidemia is the presence of a high concentration of fat in the circulating blood. *Stedman's Concise Medical Dictionary for the Health Professions* 496 (3d ed. 1997).

inmate on November 1, when the laboratory tests results would be available. He wrote that he planned to look at Armstrong's neck lesion during the appointment.

When Dr. Filippelli saw Armstrong on November 1, 2007, the inmate had taken the prescribed antibiotics for only three days. The doctor scheduled a follow-up appointment to check the cystic infected hair follicle on Armstrong's neck.

Armstrong saw Dr. Filippelli again on November 16, 2007. Dr. Filippelli wrote in the medical record that Armstrong had a "small lesion" on his neck that the inmate believed was caused by exposure to fecal waste when he was cleaning up the sewage spill in July 2007. Defs.' App. 26. The doctor stated, "It is unlikely that fecal waste (E. coli) would cause this type of folliculitis[5]." *Id.* Dr. Filippelli wrote that the "area of concern is an infected hair follicle that appears to have been irritated by shaving." *Id.* The doctor found the lesion had decreased in size due to the antibiotics, had become "barely perceptible to the eye," and could be felt "as a 1-2 mm raised bump." *Id.* "This is likely the raised ingrown hair follicle, that continues to be irritated every time he shaves," Dr. Filippelli wrote. *Id.* Armstrong admitted to the doctor that, "he has been picking at it and has pulled the hair from the area," which Filippellli stated, "has likely caused a small scar that may persist for a long time." *Id.* The doctor stated Armstrong admitted, "that the antibiotics helped to decrease the area but is upset that nothing else can be done at this time." *Id.* Dr. Filippelli believed the lesion would decrease in size on its own over time.

Dr. Filippelli noted that Armstrong's initial complaints about the July 2007 cleanup were to "what he percieved [sic] as swollen glands in his neck and patient made no mention of his cystic lesion at that time." *Id.* Armstrong was initially seen for the "lesion in October, four months since his encounter with the sewage," the doctor wrote, adding, "The time factor from this event makes any connection between his exposure to sewage and an infected ingrown hair follicle on his neck, highly unlikely." *Id.* Dr. Filippelli observed that during his initial visit with Armstrong after the July 5 cleanup, the inmate "claimed he had a sore throat," but, "he takes a nasal steroid, whose side effect profile includes 'sore throat[.']" *Id.* (alteration added). The record does not show that Armstrong complained about the infected hair follicle after the November 16 medical visit.

---

[5] Folliculitis is an "inflammation of a follicle or follicles." Rice, *supra* note 2, at 78.

Dr. Filippelli stated that in July 2010, Armstrong weighed 196 pounds. In October 2010, Armstrong's blood tested negative for HIV, hepatitis B and C, according to Dr. Filippelli. Armstrong asserts he never received a copy of these test results, and he presently seeks a copy of the results.

Dr. Ryan Bakke, Armstrong's expert, is a board certified family physician who works in the emergency department of Broadlawns Medical Center in Des Moines, Iowa. Bakke testified that prolonged exposure to raw sewage can cause serious medical consequences, including infections from bacteria, viruses, and parasites. Bakke Aff. ¶ 4. The doctor stated as follows:

> If a patient presented himself to me at the emergency department who had been exposed to raw sewage, and he suffered from a fever, chills and sweats, my opinion is that he should have been seen immediately by a doctor, had all of his vitals checked, undergone a complete examination, had a complete blood count (. . . lab test) done and started on antibiotics immediately. If the patient had not been vaccinated for Hepatitis A, tetnus [sic] and diphtheria, he should be vaccinated for those diseases immediately.

*Id.* at ¶ 5. Bakke stated, "It is probable, based on the immediate symptoms Armstrong was demonstrating, he was suffering from some sort of infection." *Id.* Without testing when a patient is sick, Bakke stated, "it is impossible to determine which, if any, bacteria, viruses or parasites were infecting him from the raw sewage." *Id.* at ¶ 6. According to Bakke, "Some infections by viruses, bacteria and parasites will resolve themselves without medical treatment. Others might not, including tetanus, Hepatitis A, B and C, HIV, and polio." *Id.* The only way to determine if Armstrong "suffers from any of these diseases is to examine him immediately, and to test him specifically for them." *Id.*

Dr. Bakke attached to his affidavit a chart listing the names of bacteria, viruses, and parasites that may be contained in sewage, their signs and symptoms, and their average latency periods. The latency periods for the listed bacteria range from six hours to fourteen days. *Id.* Attach. The latency period of the viruses, including HIV, ranges from six days to two years. *Id.* The parasites' average latency periods range from fourteen to twenty-eight days. *Id.*

In Bakke's opinion, "exposure to bleach fumes without protective gear can also have serious medical consequences," including, "eyes burning, nose irritation, coughing, respiratory damage, chronic bronchitis and airway hyperactivity." Bakke Aff. ¶ 7. He stated, however, "It is impossible to determine whether Armstrong suffered from these consequences because of the

11

delay of one month before he received medical treatment." *Id.*

## DISCUSSION

### Summary Judgment Standard

A court should grant summary judgment if the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); *Nelson v. Shuffman,* 603 F.3d 439, 446 (8th Cir. 2010). The moving party bears the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party may not rest upon mere allegations or denials in its pleadings, but must show specific facts proving that there is a genuine issue for trial in order to prevent the entry of a summary judgment. *Id.* at 324.

### Claims Against Long

Armstrong claims that Long violated his Eighth Amendment rights by forcing him to clean up raw sewage on July 5, 2007, without personal protective equipment, resulting in infection and injury. Defendants assert Long is entitled to summary judgment, in that Armstrong's claims against Long are barred under the doctrine of qualified immunity.

Qualified immunity "shields officials from suit if their conduct 'd[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ortiz v. Jordan*, __ U.S. __, __, 131 S. Ct. 884, 888 (2011) (alteration in original) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). In resolving government officials' qualified immunity claims in the context of a motion for summary judgment, a court must decide whether the facts that a plaintiff has "shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, __, 129 S. Ct. 808, 815-16 (2009) (holding the order in which a court must consider these two prongs depends on the circumstances of the case) (internal quotation and citation omitted); *see Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010) (same). The court determines whether the party opposing a motion for summary judgment sought on a qualified immunity defense "has raised any triable issued barring summary adjudication." *Ortiz*, __ U.S. at __, 131 S. Ct. at 889; *see Morris*, 601 F.3d at 808 ("[I]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can

be no summary judgment.") (quoting *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 527 (8th Cir. 2009) (en banc)).

1. Violation of a Constitutional Right

A prisoner's treatment in prison and the conditions under which he is confined are "subject to scrutiny under the Eighth Amendment," which prohibits the infliction of cruel and unusual punishment. *Schaub v. VonWald*, No. 10-1280, 2011 WL 1545455, at *6 (8th Cir. Apr. 26, 2011) (quoting *Helling v. McKinney,* 509 U.S. 25, 31 (1993)). A prison official violates an inmate's Eighth Amendment rights only when two requirements are met: (1) the alleged deprivation is, objectively, sufficiently serious; and (2) the official's state of mind must be sufficiently culpable. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see Ambrose v. Young*, 474 F.3d 1070, 1075 (8th Cir. 2007) (stating Eighth Amendment claim includes an objective prong, which concerns whether the risk of harm "was sufficiently serious," and a subjective prong, which looks at whether the officials acted "with a sufficiently culpable state of mind").

Under the subjective component, the inmate must show the officer's deliberate indifference, meaning the officer was aware of and disregarded a great risk to the inmate's health or safety. *Farmer*, 511 U.S. at 835; *see Morris*, 601 F.3d at 809 (applying to claims by pretrial detainee the same "deliberate indifference" standard applied to Eighth Amendment claims made by convicted inmates). In the context of prison work assignments, a prison official is deliberately indifferent when he knowingly compels an inmate to perform work that endangers the inmate's life or heath. *Ambrose*, 474 F.3d at 1077. "A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see Schaub*, No. 10-1280, 2011 WL 1545455, at *6 ("An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate.") (citing *Lenz v. Wade,* 490 F.3d 991, 995 (8th Cir. 2007)).

Defendants assert, and Armstrong denies, that there are no disputed material facts at issue, and that the conditions to which Armstrong was subjected during the cleanup on July 5, 2007, did not violate his Eighth Amendment rights.

As Defendants acknowledge, an inmate's exposure to excrement, including human waste, can, under some circumstances, violate the inmate's Eighth Amendment rights. *See Morris*, 601 F.3d at 812 (citing *Fruit v. Norris*, 905 F.2d 1147, 1150-51 (8th Cir. 1990) (observing that

13

"common sense" should have alerted prison officials of the health danger associated with "unprotected contact with human waste"; "[W]e note courts have been especially cautious about condoning conditions that include an inmate's proximity to human waste.")); *Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003) (per curiam) (reversing district court's granting of summary judgment in § 1983 action alleging unconstitutional conditions of confinement, where inmate had to sleep on a mattress on the floor a foot and a half away from the toilet, and when his cellmate used the toilet at night, urine splashed on to the inmate and his blankets, increasing the inmate's risk of contracting diseases); *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) ("Exposure to raw sewage may in some cases amount to cruel and unusual punishment.").

Factors courts consider in determining whether a constitutional violation has been shown based on exposure to human waste include the degree of excrement and filth to which an inmate was exposed, the length of time of the exposure to unsanitary conditions, *Owens*, 328 F.3d at 1027, *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994), whether the inmate's requests for remedial measures went unheeded, *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989), and whether the inmate was provided protective clothing and equipment, *Fruit*, 905 F.2d at 1149. When an inmate is knowingly exposed to conditions that expose him to serious diseases, the prison may choose between removing the prisoner from the unhealthy environment and protecting him from the consequences. *Powers v. Snyder*, 484 F.3d 929, 931 (7th Cir. 2007) (citing *Robbins v. Clark*, 946 F.2d 1331, 1333 (8th Cir. 1991), *Good v. Olk-Long*, 71 F.3d 314, 316 (8th Cir. 1995)). The protection provided, however, must be efficacious, *Id.*, or, if not, at least not provided in bad faith, *Good*, 71 F.3d at 316.

The Court finds that the facts and inferences in the record, when construed in the light most favorable to Armstrong, are sufficient to raise genuine issues of material fact concerning whether Armstrong has shown a deprivation of his Eighth Amendment rights. The issues include, but are not limited to, the length of time Armstrong was exposed to sewage during the July 5 cleanup process; the amount of sewage to which he was exposed; whether personal protective clothing and equipment was available to Armstrong, and, if so, whether the protective clothing and equipment was efficacious; the degree to which the bleach used during the cleanup was diluted; whether Armstrong complained to Long during the cleanup about the conditions;

and whether Long was aware of and disregarded a great risk to Armstrong's health for safety. The Court finds that the record contains sufficient evidence for a reasonable factfinder to determine that Long's actions violated Armstrong's Eighth Amendment rights.

2. Clearly Established Constitutional Right

The Court next considers whether such a constitutional right was clearly established in July 2007. *Morris*, 601 F.3d at 811. The unlawfulness must be apparent in "the light of pre-existing law." *Id.* at 812 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). For a reasonable person to know that his conduct would violate the constitution, however, "there need not be a case with 'materially' or 'fundamentally' similar facts." *Id.* (quoting *Nelson*, 583 F.3d at 531). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning" that an official's actions are unlawful. *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

The Court finds the unconstitutionality of Long's alleged conduct should have been obvious to him based both on common sense and the prior case law cited above. The Court finds that an inmate's right not to be exposed to raw sewage under the circumstances alleged and evidence shown by Armstrong in this case was clearly established before the incident on July 5, 2007. Therefore, the Court respectfully recommends that Defendants' Motion for Summary Judgment on the claim against Long be denied.

**Claims Against Dr. Filippelli**

Armstrong claims that Dr. Filippelli violated his Eighth Amendment rights by depriving him of medical care, in that the doctor provided untimely and inappropriate medical treatment after the cleanup on July 5, 2007. Defendants assert that qualified immunity bars Armstrong's claim against Dr. Filippelli.

1. Violation of a Constitutional Right

"To prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs." *Schaub*, No. 10-1280, 2011 WL 1545455, at *6 (quoting *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997)). This standard requires the inmate to show that (1) he "suffered from an objectively serious medical need," and that (2) the prison official "knew of the need yet deliberately disregarded it." *Id.* (citing *Coleman*, 114 F.3d at 784; *Farmer,* 511 U.S. at 837;

15

*Estelle v. Gamble,* 429 U.S. 97, 105 (1976)).

A serious medical need is one a physician has diagnosed as requiring treatment, or one that is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention," making verifying medical evidence unnecessary. *Id.* (quoting *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995); citing *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004)).

Deliberate indifference equates to criminal-law recklessness, which is "'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm" to the inmate. *Id.* (citing *Farmer,* 511 U.S. at 835, 839–40). Armstrong must show that Dr. Filippelli was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [that] he . . . also [drew] the inference." *Farmer*, 511 U.S. at 837 (alterations added); *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (same). Whether an inmate's condition is a serious medical need and whether the defendant official was deliberately indifferent to that need are fact questions. *Schaub*, No. 10-1280, 2011 WL 1545455, at *6 (citing *Coleman,* 114 F.3d at 785).

Dr. Filippelli essentially argues that Armstrong has not pointed to sufficient evidence to establish that (1) he was suffering from a serious medical need, and that (2) Dr. Filippelli acted with deliberate indifference to that medical need. The Court agrees. No evidence in the record indicates that Armstrong was suffering from an objectively serious medical need, that Dr. Filippelli ignored a serious medical need of which he was aware, or that delays in treatment adversely affected Armstrong's condition. *See Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (stating that to establish that a delay in medical care constituted deliberate indifference, the plaintiff must show verifying medical evidence establishing a detrimental effect of the delay). Dr. Filippelli was not involved in Armstrong's treatment until August 3, 2007. On that date, Armstrong complained of a sore throat and facial swelling, but not the fever, sweats, and chills he says he experienced for a short time immediately after the cleanup. Further, the record shows that Dr. Filippelli did not ignore Armstrong's complaints, but rather exercised his medical judgment in prescribing a course of treatment. Armstrong's disagreement with Dr. Filippelli's treatment decisions is insufficient to support a deliberate indifference claim. *See Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (stating, "mere disagreement with

16

treatment decisions does not rise to the level of a constitutional violation") (quoting *Alberson v. Norris*, 458 F.3d 762, 765 (8th Cir. 2006)); *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) (stating medical staff "do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment") (quoting *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)).

The Court finds that the facts and inferences in the record, when construed in the light most favorable to Armstrong, are insufficient to establish that Dr. Filippelli was deliberately indifferent to a serious medical need, and therefore, Dr. Filippelli is entitled to judgment as a matter of law.

2. Clearly Established Constitutional Right

Because the Court finds that the allegations and undisputed facts are insufficient make out a claim against Dr. Filippelli for a deprivation of Armstrong's constitutional right, the Court need not analyze whether the constitutional right was clearly established during the period at issue. *See Cook v. City of Bella Villa,* 582 F.3d 840, 851 (8th Cir. 2009) ("If the allegations and undisputed facts do not amount to a constitutional violation, there is no necessity for further inquiries concerning qualified immunity.") (citation omitted).

The Court respectfully recommends that Defendants' Motion for Summary Judgment be granted on Armstrong's claim against Dr. Filippelli.

**Monetary Damages Claim**

Defendants argue that Armstrong's monetary damage claim is barred because Armstrong incurred no physical injury sufficient to sustain his claim for monetary damages pursuant to 42 U.S.C. § 1997e(e).

Section 1997e(e) provides, "No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury." A district court may dismiss or grant judgment against a prisoner's claim for emotional injury for failure to comply with § 1997e(e). *Kahle*, 563 F.3d at 741 (citing *Mitchell v. Horn*, 318 F.3d 523, 533 (3d Cir. 2003); *Oliver v. Keller*, 289 F.3d 623, 629 (9th Cir. 2002)).

Here, based on Armstrong's statements in his affidavit describing his symptoms in the hours and days immediately following the cleanup, but prior to August 1, 2007, and in light of

17

Dr. Bakke's statements concerning the relation of such symptoms to a prolonged exposure to sewage, the Court finds Armstrong has pointed to sufficient evidence to establish a physical injury for purposes of § 1997e(e)'s physical-injury requirement. *See Mitchell*, 318 F.3d at 534-36 (holding § 1997e(e) requires physical injury that is more than *de minimis*, although the injury may be less than significant) (cited in *Pratt v. Corrections Corp. of America*, 124 F.App'x 465, 467 (8th Cir. 2005) (unpublished per curiam)); *see also Munn v. Toney*, 433 F.3d 1087, 1089 (8th Cir. 2006) (holding claim for denial of treatment by inmate who alleged high-blood-pressure symptoms of headaches, cramps, nosebleeds, and dizziness was not barred by § 1997e(e)).

Furthermore, § 1997e(e) is "merely a limitation on damages," and not an element of the § 1983 lawsuit. *Kahle*, 563 F.3d at 742 (quoting *Munn*, 433 F.3d at 1089). At a minimum, Armstrong could recover nominal damages on his Eighth Amendment claim. *See Munn*, 433 F.3d at 1089 (noting § 1997e(e) does not bar recovery of nominal and punitive damages, or of declaratory and injunctive relief).

For these reasons, the Court finds Defendants have not established that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on their claim that § 1997e(e)'s physical injury requirement bars Armstrong's claim for monetary damages. The Court respectfully recommends that Defendants' Motion for Summary Judgment be denied on this ground.

**Punitive Damages Claim**

"Punitive damages may be awarded under 42 U.S.C. § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Schaub*, No. 10-1280, 2011 WL 1545455, at *13 (citing *Smith v. Wade*, 261 U.S. 30, 56 (1983)). This inquiry presents a question of fact. *Id.* (citing *Coleman*, 114 F.3d at 787). The purposes of punitive damages are to punish a defendant for outrageous, intentional or malicious conduct, and to deter future similar unlawful conduct. *Id.* & n.12.

Defendants argue that punitive damages are not available under the undisputed facts of this case. Defendants contend the undisputed facts show that as a matter of law, Defendants did not act with an evil motive or reckless of callous indifference. Rather, the Defendants' actions "were based on concern for security and the normal running of a prison," and thus, "the purpose

of punitive damages would not be advanced in this case." Defs.' Mem. Supp. Summ. J. 9.

In resistance, Armstrong asserts the record, which includes the OSHA determinations and evidence indicating a "flood of raw sewage, including feces, urine, blood and mucus, which was cleaned up by inmates forced to do so without proper training and protective gear," is sufficient to support a finding that Long's conduct involved reckless or callous indifference to the protected rights of others. Br. Supp. Res. Defs.' Sec. Mot. Summ. J. 3.

The Court finds genuine issues of material fact exist, precluding summary judgment on the punitive damages claim. Those issues include, but are not limited to, the amount of filth to which Armstrong was exposed during the cleanup, the availability and adequacy of protective clothing and equipment, whether Armstrong complained to Long about the conditions, and Long's knowledge of the conditions. The Court respectfully recommends that Defendants' Motion for Summary Judgment on the claim for punitive damages be denied.

### Injunctive Relief Claim

Armstrong requests testing "for all diseases communicable and not." Compl. VI. Defendants argue that Armstrong's claim for injunctive relief is moot because he was tested for HIV, and hepatitis A and B in October 2010, and the test results were negative. Armstrong argues in his response that he never received "any proof of this testing occurring,"[6] the testing was insufficient, and he "should have been given a complete test for tetanus, Hepatitis A, B and C, HIV and polio, as well as a full blood test to determine if there are any lingering parasites, viruses, or bacteria in his blood." Br. Supp. Res. Defs.' Second Mot. Summ. J. 5.

According to Armstrong's own expert, Dr. Bakke, any diseases that Armstrong may have been exposed to in the sewage during the July 5, 2007, cleanup had a latency period of two years at most. The Court finds that ordering a "full blood screen" is unnecessary. The HIV, and hepatitis A and B tests done in October 2010 are sufficient to establish that Armstrong did not suffer any lasting serious diseases from the July 5, 2007, cleanup. The Court respectfully

---

[6] The parties do not address whether medical test results are routinely made available to inmates (free of charge or for a copying fee); whether Armstrong asked for the test results by kite or other communication; or whether Armstrong asked for the test results in discovery in this action. Armstrong did not request an extension of time for any additional discovery on this claim under Federal Rule of Civil Procedure 56(e).

recommends that Defendants' Motion for Summary Judgment on the injunctive relief claim be granted. For the purposes of complete discovery, however, the Court will order that Defendants shall produce a copy of Armstrong's October 2010 blood test results.

## RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED, under 28 U.S.C. § 636(b)(1)(B), for the reasons discussed above, that Defendants' Motion for Summary Judgment (Clerk's No. 47) be **denied** as to Plaintiff's claim against Defendant Long; **granted** as to Plaintiff's claim against Defendant Dr. Filippelli; **denied** as to the monetary damages claim; **denied** as to the punitive damages claim; and **granted** as to the injunctive relief claim.

The Court orders Defendants to produce to Plaintiff by May 10, 2011, a copy of Plaintiff's October 2010 blood test results concerning HIV, and hepatitis A and B.

IT IS ORDERED that the parties have until May 24, 2011, to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). The Court will freely grant such extensions. Any objections filed must identify the specific portion of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

IT IS SO ORDERED

Dated this 2nd day of May, 2011.

_____
CELESTE F. BREMER
UNITED STATES MAGISTRATE JUDGE